# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

LAURIANNE NICHOLS,

               Plaintiff,

     v.                                     Case No. 10-CV-64

EDWARD SCHILLING and
FOND DU LAC COUNTY,

               Defendants.

_____

# ORDER

On January 25, 2010, the plaintiff, Laurianne Nichols ("Nichols"), filed a complaint against the defendants, Edward Schilling ("Schilling") and Fond du Lac County ("County"), alleging that the defendants retaliated against Ms. Nichols for her exercise of her right of free speech in violation of 42 U.S.C. § 1983. (Docket #1). After discovery occurred, on November 19, 2010, the defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, contending that the plaintiff lacked any evidence to prove several elements of the Section 1983 claim. (Docket #23). The court has received the parties' briefs and related material on the matter and, unfortunately, the parties' efforts have been quite unsatisfactory for several reasons this court will elucidate in this opinion. Nonetheless, summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). As such, the "show must go on," and the court proceeds

to resolve the pending motion with the benefit of the materials the parties have provided.

## ADMISSIBLE EVIDENCE FOR SUMMARY JUDGMENT

Before delving into the factual background of this matter, the court pauses to address what evidence can be used by the court to determine what the undisputed facts are in this case. Several items of evidence provided by the plaintiff to argue for denial of the summary judgment motion were particularly troublesome. Specifically, the plaintiff repeatedly relies on the deposition testimony of Ms. Linda Selk-Yerges ("Selk-Yerges") taken in Wisconsin Department of Workforce Development's Equal Rights Division Case No. CR200600471, *Laurianne Nichols v. ASTOP, Inc.,* as evidence that shows a genuine dispute as to material facts exists in this case. (PPFF ¶¶ 8-10, 14-17, 24-25, 27, 30, 34). Much of the deposition testimony contains statements that one defendant, Mr. Schilling, allegedly made to Ms. Selk-Yerges. *See, e.g.,* Selk-Yerges Dep. at 44 ("What he said is he no longer would refer children for Lauri to see because of the court case."). The initial question the court must resolve is whether Ms. Selk-Yerges' deposition testimony can be used to defeat the summary judgment motion.

When a defendant moves for summary judgment on the ground that the plaintiff "lacks evidence of an essential element of his [or her] claim, the plaintiff is required by Fed. R. Civ. P. 56, if he [or she] wants to ward off the grant of the motion, to present evidence of evidentiary quality." *Winskunas v. Birnbaum*, 23 F.3d

1264, 1267 (7th Cir. 1994). It is the plaintiff's burden, as the proponent of Ms. Selk-Yerges' testimony, to establish that the "material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. 56 2010 advisory committee's notes; *see also* Fed. R. Civ. P. 56(c)(4) ("[A]n affidavit . . . used to . . . oppose a motion [for summary judgment] must . . . set out facts that would be admissible in evidence."). Fed. R. Civ. P. 32 places a notable condition on when a deposition from another action can be used in the course of civil litigation, such as when such a deposition is utilized to defeat a summary judgment motion. *See Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994). Fed. R. Civ. P. 32(a)(8) permits the use of a "deposition taken in an earlier action" in a "later action" involving "the same subject matter between the same parties, or their representatives or successors in interests." Moreover, Fed. R. Civ. P. 32(a)(8) further permits a deposition previously taken to be used as allowed by the Federal Rules of Evidence, which, in turn, similarly allows deposition testimony from another proceeding to be used only if "the party against whom the testimony is now offered . . . or a predecessor in interest . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). The sum of the various rules governing the use of deposition testimony is that deposition testimony taken in a different case involving different parties is inadmissible and cannot be considered on a summary judgment motion. *See Northwestern Nat'l Ins. Co.,* 15 F.3d at 662; *see also Hughes v. City of Chicago*, 673

F. Supp. 2d 641, 651 (N.D. Ill. 2009) ("At the summary judgment stage, a party may rely on deposition testimony from a separate action where the case involved the same parties and subject matter") (internal citations omitted).

In this case, the deposition being used to counter the motion for summary judgment was taken in Ms. Nichols' litigation against her former employer, ASTOP, Incorporated ("ASTOP"). As far as the court can discern, the litigation occurred through an administrative arm of the Wisconsin Department of Justice called the Equal Rights Division. Neither Mr. Schilling or the County were involved in that litigation. As the burden of proving that the deposition testimony is admissible or would take some other form at trial falls on the proponent of the testimony, *see Hughes,* 673 F. Supp 2d. at 651, and, because Ms. Nichols has not shown that the defendants in the case at bar were parties to that action, the court is obliged to strike the testimony of Ms. Selk-Yerges given in another matter and will not consider it in resolving the motion for summary judgment.[1]

The court also notes that there are two other affidavits provided by the plaintiff in opposition to the defendants' motion that the defendants argue the court should not entertain in reviewing the motion for summary judgment. Specifically, the defendants contend that the affidavits of Ms. Janet Brenner ("Brenner") (Docket #35)

---

[1] Because the deposition of Ms. Selk-Yerges was not taken with regard to this case, the typical dispensation afforded deposition testimony with regard to the hearsay rules at summary judgment is not applicable in this matter. *Cf. Winskunas,* 23 F.3d at 1267-68; *see Acme Printing Ink Co. v. Menard, Inc.,* 812 F. Supp. 1498, 1522 (E.D. Wis. 1992) (holding that a deposition is not the equivalent of an affidavit).

and Ms. Sara Laskowski ("Laskowski") (Docket #36) should be struck because they contain inadmissible hearsay. (Def.'s' Reply Br. at 3). It is well-established that "a party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The bulk of Ms. Brenner's affidavit attests to statements made by or to Ms. Selk-Yerges that were than transmitted to others, eventually reaching the affiant.[2] (Brenner Aff. ¶¶ 6, 8-12). The same can be said of Ms. Laskowski's affidavit. (Laskowski Aff. ¶¶ 9. 10-14). The statements are submitted to prove the truth of the matter asserted[3] and are "classic hearsay" where no exception under Fed. R. Evid. 803 or 804 is applicable. *Gunville,* 583 F.3d at 985. Moreover, of the remaining statements within Ms. Brenner's and Ms. Laskowski's respective affidavits that do not contain blatant hearsay, many of the statements are of the affiant's "beliefs" that the defendants unlawfully retaliated against Ms. Nichols (Brenner Aff. ¶¶ 14-19; Laskowski Aff. ¶¶ 16-21), statements that do not appear to be based on any

---

[2] For example, Ms. Brenner attests that it was "common knowledge that" Mr. Schilling was "referring to firing Ms. Nichols when he made the comment about 'shooting puppy in the head'" to Ms. Selk-Yerges. (Brenner Aff. ¶ 10).

[3] In this case, the truth of the matter asserted is the truth that Mr. Schilling did indeed make various comments to Ms. Selk-Yerges. The court notes that the statements of Mr. Schilling in and of themselves are not hearsay under Fed. R. Evid. 801(d), but those statements cannot be used as evidence against the defendants if the only vehicle to have such statements come into evidence is more hearsay. *See* Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded . . . if *each* part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

personal knowledge of the affiants in violation of Fed. R. Civ. P. 56(c)(4). *See Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) (affirming the exclusion of affidavits that are not "substantiated by specific facts" and "bald assertion[s] of the general truth of a particular matter."). As such, the court will disregard the portions of the affidavits of Ms. Brenner and Ms. Laskowski that contain either hearsay statements or are not based upon personal knowledge in determining what the undisputed facts are in this case.

There are two remaining pieces of evidence the court must review with regard to their admissibility to challenge the defendants' motion. First, the court finds that statements that Ms. Selk-Yerges allegedly said as noted in the deposition testimony of Ms. Nichols likewise cannot be used to defeat summary judgment, as such evidence is also hearsay testimony. *Gunville,* 583 F.3d at 985 (excluding hearsay evidence elicited from a deposition). Finally, the court finds that two newspaper articles offered by the plaintiff to defeat summary judgment are also inadmissible, as the articles, out-of-court statements, are offered primarily to prove the truth of a series of statements attributed to defendant Schilling in those articles.[4] *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (noting that hearsay, such as newspaper articles, is inadmissible in summary judgment proceedings to the

---

[4] The court also notes that the plaintiff has not suggested a hearsay exception that would viably apply to newspaper articles.

same extent that it is inadmissible in a trial). With these evidentiary rulings in mind,[5]

the court proceeds to discuss the factual background of the litigation.[6]

## FACTUAL BACKGROUND[7]

### A.    ASTOP and Ms. Nichols' Complaints About the County

As hinted at above, this case centers around a private, Wisconsin non-stock

corporation named ASTOP Incorporated ("ASTOP") based in Fond du Lac,

Wisconsin. (PPFF ¶ 1). The name ASTOP derives from the phrase "Assist Survivors

Treatment Outreach Prevention." *See* ASTOP Home, 2008, http://www.astop.org/

(last visited April 27, 2011). ASTOP's self-espoused purpose is to help "rebuild the

worlds . . . of those people whose lives are shattered by the ugliness of sexual

---

[5] To be clear, the decision to disregard the above-mentioned evidence presented by the plaintiff means the court will likewise disregard or partially disregard the following findings of fact presented by the plaintiff, as they are supported by inadmissible evidence: findings at paragraphs 9 -11, 14-15, 19-20, 24-30, 34.   If a finding of fact is only partially disregarded, the court will elucidate what parts of a finding of fact were used in the discussion of the undisputed facts of this case.

[6] The court notes that the defendants raised the arguments that the court should strike the deposition of Ms. Selk-Yerges, portions of the affidavit of Ms. Brenner, portions of the affidavit of Ms. Laskowski in the reply brief, portions of Ms. Nichols' testimony, and the newspaper articles – the first opportunity the defendants had in which to counter such evidence.   Despite being given ample time to file a motion for leave to file a surreply – the defendants' reply brief was filed in January of 2011 (Docket #38) – the plaintiff has not responded to the contention that Ms. Selk-Yerges' testimony is inadmissible.  The plaintiff's silence is telling.

[7] The court notes in passing that the findings of facts submitted by both sides were extremely frustrating for the court to sift through because of both parties' failure to provide any background information to the court.  Several acronyms were used without an explanation of what those acronyms stood for, and both sides failed to provide basic background information, such as the nature of ASTOP's business structure, the means by which Fond du Lac County administers to those that are victims of sexual assault, the interrelationship between the County and ASTOP, or even explaining Mr. Schilling's occupation.  The court appreciates that both parties are or should be intimately familiar with the details of this litigation, but that does not mean the court similarly begins with that same knowledge base.

assault." *Id.* To accomplish this lofty purpose, ASTOP provides "various services," including providing victims of sexual assault with "emotional support," counseling, and a "crisis telephone center which takes phone calls from people in distress." (DPFF ¶¶ 16-17). The private corporation, through its representatives, also gives "public presentations on ways in which to avoid assaults, how to recognize symptoms of assault, [and] how to report assaults." *Id.* ¶ 17. ASTOP has a board of directors, whose president is Ms. Carolyn Keeler ("Keeler"), having held that position since "approximately 1995." *Id.* ¶ 15. Ms. Linda Selk-Yerges is the Director of ASTOP, running the "organization on a day to day basis." *Id.* ¶ 18; *see also* PPFF ¶ 1.

Beginning in August of 1997, the plaintiff was employed as a licensed clinical social worker for ASTOP, helping provide "mental health services to individuals seeking treatment with" the organization. (PPFF ¶ 2); *see also* DPFF ¶ 19. The plaintiff reported directly to Ms. Selk-Yerges. (PPFF ¶ 1). Ms. Nichols testified in a deposition in this matter that, commencing in January of 2004, she complained to "a number of agencies," alleging that invidious "discrimination" occurred by Fond du Lac County and its Department of Social Services ("DSS") against several of ASTOP's clients because of their cognitive disabilities. *Id.* ¶ 4. DSS is the administrative arm of the County that oversees various "plans and programs" aimed at ensuring "the self-sufficiency of individuals and families, to protect the safety of family members and the public and to ensure the efficient administration and use of

resources that are needed to effectively implement those plans for the residents of Fond du Lac County," such as foster care programs and programs aimed at preventing child abuse. *See* Fond du Lac County, Wisconsin: Social Services, http://www.fdlco.wi.gov/Index.aspx?page=80 (last accessed April 27, 2011). Ed Schilling was the Director of DSS during the relevant events that brought rise to this action. (Compl. ¶ 7; Answer ¶ 7). Among the complaints informally lodged by Ms. Nichols regarding DSS's actions, the plaintiff contended the County was "discriminating" by preventing Ms. Bonnie Coffman ("Coffman"), an ASTOP client, from retaining custody of her children because of Ms. Coffman's "disability and . . . poverty." *See* Nichols Dep. at 21. Ms. Nichols testified that she made complaints about the County's treatment of two ASTOP clients to Tom Storm, then the Fond du Lac County District Attorney, the person responsible for the prosecution of state criminal laws and child protective service matters in Fond du Lac County. *Id.* ¶ 5. The plaintiff also testified that she raised similar issues to the American Civil Liberties Union, the Wisconsin Coalition for Advocacy, and the State Department of Justice, including its Victims Rights Office. *Id.* ¶¶ 6-7. Many of the direct complaints made by Ms. Nichols to the various groups did not take any written form as she "only had discussions with" groups like the State Department of Justice. (Nichols Dep. at 107).

However, there is some written evidence of the plaintiff's complaints regarding the County's treatment of various clients of ASTOP. For example, Ms. Nichols

assisted Ms. Coffman in "drafting a written complaint alleging that DSS had discriminated against her on the basis of . . . her disability." (PPFF ¶ 8).[8]  The written complaint, dated April 19, 2004, was submitted by Ms. Nichols on Ms. Coffman's behalf to Ms. Barbara Roznowski of the State of Wisconsin Department of Health and Family Services.  (Docket #36-12 Ex. 35).  Ms. Coffman's complaint provided a laundry list of issues the ASTOP client had regarding DSS's treatment of her and her children.[9]  *Id.*  The plaintiff has also provided admissible evidence that on February 9, 2005, she wrote a letter to a "Dr. Braacksma" regarding another ASTOP client.[10]  (PPFF ¶ 12).  Ms. Nichols' February 9, 2005 letter described her "serious concerns about the . . . procedures" that were used by police officers in questioning children during a sexual assault investigation.   (Docket #37-13).

The plaintiff continued to raise her concerns about DSS misconduct with outside groups well into the fall of 2005.  Specifically, Ms. Nichols testified that she met with Ms. Sharon Lewandowski ("Lewandowski"), the Domestic Violence

---

[8] The defendants do not dispute the first portion of PPFF ¶ 8 and, therefore, it is undisputed. The discussion section of this order will discuss the *relevancy* of PPFF ¶ 8.

[9] These "issues" included:  (1) a lack of "collaboration" between DSS and Ms. Coffman and the therapists at ASTOP; (2) repeated and burdensome changes imposed on Ms. Coffman with regard to the "case plan" for reunification with her children; (3) DSS social workers providing false information to Ms. Coffman's children's therapists and clinicians; (4) DSS treating Ms. Coffman unfairly because of her "indigence," "cognitive and mental health functioning"; (5) DSS staff failing to correctly assess allegations of sexual abuse "in persons having" "developmental" or "cognitive" disabilities; and (6) DSS inappropriately resolving its disagreements with Ms. Coffman and ASTOP, including communicating through the children.  (Docket #36-12 Ex. 35).

[10] The court notes that the defendants' objection to PPFF ¶ 12 is with regard to whether Ms. Nichols was acting "outside of her job duties" in writing the letter to the doctor, a legal issue that the court will discuss later in this order.  (Def's' Resp. to PPFF ¶ 12).

Coordinator for the Wisconsin Department of Health & Family Services, to "discuss . . . concerns and complaints of discrimination" by DSS "against [sexual abuse] survivors with cognitive disabilities."[11] (PPFF ¶ 18). However, the plaintiff has not submitted any admissible evidence with regard to the results of her conversations with Ms. Lewandowski, such as what Ms. Lewandowski did as a result of the plaintiff's revelations.[12] Indeed, more generally, it does not appear that any of the people or groups that Ms. Nichols complained to did anything of consequence as a result of the plaintiff's complaints. Moreover, the plaintiff has not presented any evidence indicating that the defendants were aware of the *breadth* of parties to whom Ms. Nichols voiced concerns about the defendants' conduct.

## B. The County's Reaction to Ms. Nichols' Complaints

Nonetheless, the defendants did eventually become aware of some of Ms. Nichols' complaints. In February of 2005, Mr. Schilling was "informed' or "advised" that Ms. Nichols was "advising clients or suggesting to clients" that "they not be interviewed by DSS." *See* Schilling Dep. at 34. The defendants' exact response to what Ms. Nichols was telling her clients is unclear. Mr. Schilling testified that he talked to Ms. Selk-Yerges about what he had heard, and she, in turn, took the issue "under advisement." *Id.* at 36. While the parties utterly failed to explain to the court

---

[11] The defendants do not dispute the first portion of PPFF ¶ 18, and therefore it is undisputed. The discussion section of this order will discuss the *relevancy* of PPFF ¶ 18.

[12] The court finds that PPFF ¶ 19 is supported only by inadmissible hearsay, comments that Ms. Lewandowski made to Ms. Nichols. (Nichols Dep. at 77).

why Mr. Schilling, a public official and the director of DSS, would talk with the director of a private corporation about her employees, the court understands from its reading of the deposition transcripts in this matter that DSS regularly referred people affected by sexual abuse in the county to private agencies, such as ASTOP, for counseling and, therefore, a conversation between County and ASTOP officials was not wholly unusual.[13] (Schilling Dep. 35, 41, 44). Ms. Nichols testified in her deposition in this case that, in the following month, the Deputy Director of DSS, Ms. Kim Mooney ("Mooney"), told the plaintiff that she was not allowed to attend county training for interviewing children.[14] (PPFF ¶ 14; Nichols Dep. at 111). The County, however, disputes that it excluded Ms. Nichols from the training. (Def.'s' Resp. to

---

[13] The failure of the parties to elucidate any sort of background information on the relationship between ASTOP and the County in their respective findings of fact is absolutely unacceptable. The court should not be forced to all but guess at critical aspects of the background of this matter.

[14] The court was very close to excluding in its entirety PPFF ¶ 14, which stated that, "In March 2005, [the County's Department of Social Services excluded Ms. Nichols from training." Beyond being supported by evidence the court has already found to be inadmissible, such as Ms. Selk-Yerges deposition and the affidavits of Ms. Brenner and Ms. Laskowski, paragraph 14 is supported by a citation to four pages (92-94, 111) of Ms. Nichols' deposition and an Exhibit from Mr. Schilling's Deposition. Pages 92 to 94 of Ms. Nichols testimony indicate that the only reason that she thinks that DSS excluded Ms. Nichols from county training is because of comments Ms. Selk-Yerges made to the plaintiff, classic hearsay. *See* Nichols Dep. 93 ("Q: And you were not invited? A: I was explicitly excluded. Q: And how do you know that? A: I was told that by Selk-Yerges. Q: Anybody at the County ever tell you that? A: No."). Moreover, the exhibit from Mr. Schilling's deposition does not support PPFF ¶ 14 (or ¶ 15, for that matter). (Docket #37-5). However, page 111 of the deposition is cited to support the finding, as well. On page 111 of the deposition, Ms. Nichols contradicts her earlier testimony and answers affirmatively to the question of whether Ms. Mooney told her that she could not come to the county training held in March of 2005. As Ms. Mooney, an agent of the County, allegedly made the statement, the statement is not hearsay under Fed. R. Evid. 801(d)(2). Accordingly, the deposition testimony at page 111 is admissible evidence, and the court will rely on it in making a ruling on summary judgment. Nonetheless, for reasons stated later in this opinion, because Ms. Mooney's was reacting to comments made by Ms. Nichols to her patients, speech that was done according to the plaintiff's official duties, the court's resolution of the facts in PPFF ¶ 14 is largely academic.

PPFF ¶ 14) ("County personnel have no recollection of excluding plaintiff from training.").

In the "late summer" of 2005, it was "reported" to Mr. Schilling that Ms. Nichols had "communicated to a public defender in a criminal case that she had exculpatory evidence that the DSS and [Fond du Lac Police had] improperly interrogated" a sexual abuse victim."[15] (PPFF ¶ 13). On August 30, 2005, a meeting occurred that was attended by Ms. Mooney, Ms. Selk-Yerges, ASTOP board member Dr. Jim Salasek, Mr. Schilling, and the City of Fond du Lac Chief of Police. (PPFF ¶ 16). At that meeting, Ms. Nichols' complaints regarding police and DSS misconduct in the interrogation of child victims were discussed, and Mr. Schilling made a request to ASTOP's agents that any sexual abuse cases involving children that were referred to the organization by the County and were in the initial investigative stage be assigned to a counselor other than Ms. Nichols.[16] *Id.* ¶ 17; *see also* Schilling Dep.

---

[15] The court notes that PPFF ¶ 13's date of February 2005 is not supported by the deposition testimony cited to support the finding.

[16] The court also notes that PPFF ¶ 17 is interpreted by the court to mean what the deposition testimony that underlies the finding states: that Mr. Schilling asked ASTOP officials that "new sexual abuse cases involving children in the investigative stage" not "be handled by the plaintiff." (Def.'s' Resp. to PPFF ¶ 17).

at 41, 44-45.[17] The rationale for Mr. Schilling's request was to avoid a conflict of interest where the DSS would be "working with" or "collaborating with" someone accusing them of wrongdoing. (Docket #37-8). Mr. Schilling testified, however, that "ASTOP was not able to . . . comply with the request of DSS." (Schilling Dep. at 48; Def.'s' Resp. to PPFF ¶ 17).

However, there is some evidence that the County's support for ASTOP diminished beginning in March of 2005. For example, the plaintiff testified in her deposition in this case that beginning in March of 2005 DSS "cut in half" all of the referrals the department made to ASTOP. (PPFF ¶ 22). Ms. Nichols also testified that DSS was the "only government agency that made referrals to ASTOP" and that DSS referrals constituted "the bulk of the referrals" ASTOP received.[18] *Id.* at ¶ 21.

---

[17] PPFF ¶ 20 reads that "Mr. Schilling instructed his staff to tell clients to stop coming to ASTOP, and called Ms. Nichols's credentials into question as a result." The plaintiff supports this finding with a citation to two pages of Ms. Nichols' deposition (91, 110). Page 110 of the deposition contains a series of statements about what Mr. Schilling said to Ms. Selk-Yerges, which is inadmissible hearsay. (Nichols Dep. 110) ("During the meeting in February between Linda Selk-Yerges and Ed Schilling, Ed Schilling indicated his staff were going to be starting to do that.").On Page 91, Ms. Nichols testified that DSS "had told [a] client to stop coming to ASTOP," but does not state the basis for her opinion. *Id.* at 91 ("It does not specifically state that, but that is what my recall is."). Given Fed. R. Evid. 601's requirement that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," the court finds that page 91 of the testimony comes no where close to supporting the finding of fact proposed by the plaintiff.

[18] The defendants dispute PPFF ¶¶ 21-22 because they "do not know if it is accurate or not." (Def.'s' Resp. to PPFF ¶¶ 21-22). The defendants have not provided any evidence to dispute Ms. Nichols' admissible testimony, and, as such, the findings are undisputed. Civil L.R. 56(b)(4).

Beyond receiving referrals from DSS, ASTOP relied on the County in another important way that was diminished in 2006. ASTOP's income derives in part from several government grants, including, at times, grants from Fond du Lac County. (PPFF ¶ 25; Compl. ¶ 11; Answer ¶ 11). In fact, the County's willingness or non-willingness to provide grants to ASTOP is central to this case, necessitating the court briefly take a step back and discuss how funding for such grants are approved by the County. Mr. Allen Buechel ("Buechel"), who serves as the Fond du Lac County Executive (DPFF ¶ 1), is tasked each year with proposing a budget for the County, that could potentially include a grant to an organization like ASTOP, to Fond du Lac County's Board of Supervisors ("County Board"). *Id.* ¶¶ 2, 4. The County Board consists of eighteen members, who are representatives of a separate district within the county, having been elected by the voters in a given district. *Id.* ¶ 3. The County Executive will "typically" propose the budget for a given year to the County Board in the "late summer or early fall" of the previous year. *Id.* ¶ 5. The County Board, in turn, will refer the budget to a five member sub-committee called the "Finance, Personnel, and Economic Development Committee,"[19] which will "consider" the budget and hold "public information sessions on the budget." *Id.* ¶¶ 6-7. After their "work on the budget" has been finalized, the Finance, Personnel, and Economic Development Committee votes on the budget and sends the budget

---

[19] The parties refer to the Finance, Personnel, and Economic Development Committee in countless different ways. The court will merely refer to the name provided by the defendants in the findings of fact or will refer to the subcommittee as the "Finance Committee."

to the entire County Board for consideration and approval. *Id.* ¶ 8. The County Board can "alter or amend the budget" proposed by the subcommittee or may adopt the budget as proposed. *Id.* ¶ 9. Once the County Board approves the budget, the County Executive can either approve the budget or veto any changes the County Board made to the original budget. *Id.* ¶ 10. The County Board, in turn, has the opportunity to vote to override the County Executive's veto. *Id.*

Returning to the central issue in this case, sometime in 2005, the County Executive, Mr. Buechel, informed ASTOP that the 2006 budget he was proposing to the County Board would not include a $15,000 grant for ASTOP, as had been the case in previous budgets.[20] (PPFF ¶ 25; Supp. Aff. Buechel ¶¶ 3-4). Mr. Buechel's proposal did not influence ASTOP's grant for 2005, as ASTOP had already received its $15,000. (Schilling Dep. at 155). The reasons for why the $15,000 grant for ASTOP was removed in the 2006 budget are disputed and, frankly, unclear. Mr. Schilling testified that a newspaper article's statement that the ASTOP funding was removed "in response" to the plaintiff's "letter alleging improper interviewing

---

[20] The court relies on PPFF ¶ 25 to the extent that the finding is supported by admissible evidence. As Ms. Selk-Yerges' deposition and exhibit nine (Docket #37-8) are the bases of support for the finding, the court finds that the PPFF ¶ 25 is not supported with admissible evidence. However, the defendant agrees with the finding based on the supplemental affidavit of Mr. Buechel. (Def.'s' Resp. to PPFF ¶ 25). As such, the court only relies on the statement in PPFF ¶ 25 to the extent that it is supported by Mr. Buechel's supplemental affidavit.

techniques used by investigators"[21] was an "accurate statement."[22] (Schilling Dep. at 129-30). However, the former director of DSS testified that ASTOP's cuts in funding were due to "funding shortages." *Id.* at 70. Mr. Buechel, citing several other organizations that likewise received reduced funding in the 2006 budget proposal, corroborates that ASTOP's grant was eliminated for purely fiscal reasons. (Buechel Supp. Aff. ¶ 2) ("I proposed eliminating funding for ASTOP from the budget due to . . . financial constraints."). However, the funding shortages did not prevent Mr. Schilling from attending a "County Finance, Taxation, and Personnel Committee meeting" in late 2005 and gaining authorization by that body to be able to expend DSS funds on counseling services for juvenile sexual assault victims that were in the investigation process from "Doll & Associates," another mental health and consulting service.[23] (PPFF ¶ 28; Schilling Dep. at 71).

---

[21] The letter referenced in the deposition testimony is presumably the February 9, 2005 letter Ms. Nichols sent to Dr. Braacksma.

[22] However, it is unclear from the deposition testimony whether the phrase "accurate" was an assessment of the reasons proffered by the newspaper article for the funding or was simply an assessment as to truth of whether such a statement was made in the newspaper article. *Id.* at 129 ("Q: His words are accurate, though, aren't they? A: They are accurate for what he said. I cannot say that they are accurate words . . . Q: I'm not suggesting that he's quoting you there. A: Okay . . . Then I understand . . . Q: Then this first paragraph is an accurate statement? A: Yes."). The court is not relying on the newspaper article as evidence for reasons stated earlier in this opinion. Rather, the court is merely noting that Mr. Schilling testified, based on his personal knowledge, that the statement that was made by the newspaper article was declared "accurate," for whatever that admission is worth once the court has given an inference favoring the non-moving party.

[23] The plaintiff has not presented evidence that the funding given to Doll & Associates in December of 2005 was at the expense of ASTOP, as Mr. Schilling testified that ASTOP had already received its full grant by that time. (Schilling Dep. at 155). Instead, the funding appears to have been supplemental in nature. *Id.*

The plaintiff has not presented any evidence that Mr. Schilling or DSS is in someway *formally* involved in the budget process, such as having a vote on the budget. However, Mr. Schilling testified in his deposition in this matter that he kept the County Executive apprised of the "situation" with Ms. Nichols throughout the budget process. (PPFF ¶ 23; Schilling Dep. at 62). On the other hand, Mr. Schilling testified that he never specifically discussed "a reduction in ASTOP funding" with Mr. Buechel. (Schilling Dep. at 67). Mr. Buechel, in turn, states in an affidavit that his proposal to "cut funding for ASTOP in the 2006 budget had nothing to do with any alleged controversy between Laurianne Nichols and Fond du Lac County." (Buechel Supp. Aff. ¶ 6).

Ultimately, the County Board of Directors eventually voted to approve a budget that "did not allocate any money to ASTOP." (DPFF ¶ 12). Moreover, the County Executive did not veto any portions of the 2006 budget, meaning, initially the approved 2006 budget for Fond du Lac County did not allocate any funding for ASTOP. *Id.* ¶ 13.

## C.    The End of Ms. Nichols' Employment with ASTOP

On December 7, 2005, Ms. Nichols was "given the choice of being fired or resigning from ASTOP." (DPFF ¶ 20) Soon after, Mr. Schilling was informed by ASTOP that Ms. Nichols has been placed on a leave of absence, with ASTOP awaiting whether Ms. Nichols would honor the organization's request that she resign. (PPFF ¶ 31). Ultimately, ASTOP's president Ms. Keeler made the decision to

terminate Ms. Nichols' employment with ASTOP.[24] (DPFF ¶ 21). Ms. Keeler, in her affidavit, states that Ms. Nichols' employment was terminated because the plaintiff had said "she had no faith" in the ability of ASTOP's director to run the organization. (Keeler Aff. ¶ 6). ASTOP's president further avers that "neither the Fond du Lac County [DSS], nor its director Ed Schilling, put any pressure on ASTOP to terminate Ms. Nichols." *Id.* ¶ 7.

Nonetheless, shortly after Ms. Nichols was fired, Mr. Schilling returned to the County Finance, Taxation, and Personnel Committee and asked that the work DSS was referring to Doll & Associates be "give[n] back" to ASTOP. (PPFF ¶ 32). The reason given by Mr. Schilling for the DSS's change in tune was that a "conflict of interest" no longer existed, in that no longer were "allegations of misconduct against DSS" being lodged by an ASTOP employee. *Id.* ¶¶ 33-34. In line with Mr. Schilling's request, on March 15, 2006, Mr. Schilling and Ms. Selk-Yerges drafted "a memo to the County stating that 'disputes' between ASTOP and the County DSS had been resolved and that funding should be reinstated." *Id.* ¶ 36. A week later, the Fond du Lac County Board passed a supplemental resolution which authorized the allocation of money for ASTOP for the year 2006, restoring $14,000 of funding to ASTOP. (Buechel Aff. ¶ 12; PPFF ¶ 37).

---

[24] The only dispute that the plaintiff has with DPFF ¶ 21 is premised on Ms. Selk-Yerges' deposition. (Pl.'s Resp. to DPFF ¶ 21). As such, the paragraph is admitted for purposes of summary judgment. *See* Civil L.R. 56(b)(4).

Nearly four years later, Ms. Nichols filed a complaint in this court, alleging that the defendants retaliated against the plaintiff because of her exercise of her right of free speech in violation of 42 U.S.C. § 1983. (Docket #1). After appropriate discovery occurred in this matter, on November 19, 2010, the defendants moved this court pursuant to Fed. R. Civ. P. 56 to grant summary judgment based on the "absence of any genuine issue as to any material fact" and the defendants' "entitlement to judgment as a matter of law." (Docket #23). The court proceeds to examine the legal efficacy of the summary judgment motion.

## DISCUSSION

Summary judgment is appropriate when the full record shows that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Thomas v. H&R Block Eastern Enters.*, 630 F.3d 659, 663 (7th Cir. 2011); *see also* Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In deciding whether summary judgment should be granted, the court construes all facts and draws all reasonable inferences in favor of the nonmoving

part.  *Thomas,* 630 F.3d at 663; *see also Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008).  However, the party opposing the motion may not rely on "mere allegation or denials of [the] pleading," *Anderson,* 477 U.S. at 256, but instead must present genuine, admissible evidence that shows a factual dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The plaintiff's complaint raises a solitary claim, contending that the defendants violated 42 U.S.C. § 1983.  (Compl. ¶¶ 38-39).  To recover under Section 1983, a plaintiff must show that:  (1) he or she has been deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon the plaintiff by a person or persons acting under color of state law.  *McKinney v. Duplain,* 463 F.3d 679, 683 (7th Cir. 2006).  In this case, the plaintiff's complaint contends that both Mr. Schilling and the County denied Ms. Nichols her "federally protected right of free speech" (Compl. ¶ 39) by taking adverse action against the plaintiff as a result of her free speech activity.  Only the first element of a Section 1983 claim is disputed in this case, as the defendants do not argue that they did not act under the color of state law in taking the actions that allegedly deprived Ms. Nichols of her rights under the First Amendment.  As such, the court will only focus on the first issue in this order.  However, before determining whether the plaintiff has provided enough evidence to prove a First Amendment retaliation claim under Section 1983, the court must first determine whether the defendant County can be subject to Section 1983 liability.

## A.    The County's Liability

Pursuant to the Supreme Court's teachings in *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1978), municipalities, such as Fond du Lac County, cannot be held liable for constitutional torts under 42 U.S.C. § 1983 "on a *respondeat superior* theory." *Id.* at 691. Instead, a municipality can only be held liable under Section 1983 if the constitutional violations at issue are caused by a municipal policy or custom. *Id.* at 696. The "official policy" requirement for Section 1983 liability distinguishes "acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)). A plaintiff may establish municipal liability by showing that the constitutional deprivation was caused by: (1) the enforcement of an express policy; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) a person with final policymaking authority. *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). The ultimate question for municipal liability is whether the "promulgator, or the actor, as the case may be – in other words, the decisionmaker – was at the apex of authority for the action in

question." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001). The plaintiff bears the burden of proving her claim against the County is viable under *Monell*. *Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985).

Ms. Nichols' exclusive argument for why the County should be held liable under *Monell* relates to the County Board's decision to cut ASTOP's funds for the 2006 budget.[25] *See* Pl.'s Resp Br. at 10 ("The cutting of funding that directly caused Ms. Nichols's discharge was the 'result of municipal custom, policy, or practice.'"). The plaintiff does not argue that an *express* municipal policy was in effect that allowed for funding cuts to occur for the purpose of silencing someone. *Id.* at 10 ("Here, the discriminatory action did not involve the passage of ordinances with the intent to cut ties with ASTOP."). Instead, the plaintiff's theory of the Section 1983 claim against the County is that "Mr. Schilling was integrally involved in advising and influencing other County officials, including the [Finance, Taxation, and Personnel Committee], into taking certain actions in order to have ASTOP's funding removed" in an attempt to quash Ms. Nichols' speech. (Pl.'s Resp. Br. at 9); *see also id.* at 11 ("Mr. Schilling went to the Finance Committee through an established County procedure for the specific purpose [sic] cutting ASTOP's funding because of Ms. Nichols' criticism of DSS."). However, such a theory cannot be the basis for municipal liability because of a "widespread custom or practice," as the plaintiff has not presented any evidence that demonstrates a "series of violations" or a "pattern"

---

[25] In other words, the plaintiff does not argue that any other conduct taken by Mr. Schilling was the equivalent of a policy of the County.

of unconstitutional behavior on the part of the municipality.[26] *See Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice"); *see also Holmes v. Sheahan*, 930 F.2d 1196, 1202 n.4 (7th Cir. 1991) (holding that a plaintiff attempting to establish *Monell* liability must point to facts outside their case alone and establish that it was the municipal bodies "persistent and widespread practice" to commit the unconstitutional act). Therefore, the only available avenue for Ms. Nichols to establish municipal liability is for her to present evidence that her constitutional injury was "caused by an individual with final policymaking authority with respect to the subject matter in question." *Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009).

Remarkably, for a plaintiff whose only credible means for proving municipal liability is through demonstrating her constitutional injury was caused by a "final policymaker," Ms. Nichols' brief does not even discuss who constituted the "final policymaker" who allegedly withdrew funding for ASTOP as a means of retaliating against Ms. Nichols' free speech activity. The plaintiff seemingly concedes the defendants' assertion that "the county board is the decisionmaker in this case."

---

[26] The plaintiff asserts that "Mr. Schilling went to the Finance Committee through an established County procedure." (Pl.'s Resp. Br. 11). The plaintiff does not identify what the procedure is or how it can be deemed to be "established." More to the point, the plaintiff cannot identify any instance outside of the facts of this case where the County Board wholly relied on the recommendations of others to establish the budget. Given the plaintiff's burden, the court cannot find that a pattern of unconstitutional behavior existed in this case.

(Def.'s' Br. at 7). The court uses the phrase "assertion" because, despite the fact that "a person's status as a final policymaker for the purposes of § 1983 is a question of state or local law," *Kujawski*, 183 F.3d at 737, the defendants cite to no state or local law for the contention that the "county board is the decisionmaker." However, the defendants' assertion appears to be the correct one. *See* Wis. Stat. 65.90. Given that, the issue is whether the plaintiff has presented any evidence to show that the constitutional injury was caused or ratified by the County Board in conjunction with the County Executive.

While never formally discussed by Ms. Nichols in her brief to the court, the plaintiff appears to be arguing that Mr. Schilling became the *de facto* final policymaker because the County Board and the County Executive accepted Mr. Schilling's recommendation to deny funding to ASTOP.[27] (Pl.'s Resp. Br. at 10). "However, 'liability requires more than the fact that a . . . supervisor took some action that was not later reversed by a policymaker.'" *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) (internal quotations omitted). "The Board's following [Mr. Schilling's] recommendation is not enough to prove that [Schilling] was a final policy maker." *Id.* Instead, to maintain a Section 1983 claim against the County, Ms. Nichols "must demonstrate that the Board either delegated final policy making authority to" Mr. Schilling or "ratified" Mr. Schilling's action. *Id.*

---

[27] Indeed, the plaintiff does not cite to *any* case law in its brief in making arguments that seemingly are premised on delegation or ratification theory. (Pl.'s Resp. Br. 10-11).

However, the plaintiff has not provided any evidence to support a finding of municipal liability based on delegation. Under "delegation theory," in order for *Monell* liability to attach, the "person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions," to the person who took the adverse action. *Id.; see also Gernetzke,* 274 F.3d at 469 ("Delegation is not direction; authorization is not command; permission does not constitute the permittee the final policymaking authority."). Here, the plaintiff has provided evidence that Mr. Schilling kept the County Executive and the County Board, including the finance subcommittee, "apprized [sic] of the 'situation'" with Ms. Nichols throughout the budget process. (Schilling Dep. at 62). Moreover, Ms. Nichols has also provided the court with evidence that the funding for ASTOP was renewed after Mr. Schilling made such a request to the finance subcommittee following the termination of Ms. Nichols' employment. (PPFF ¶¶ 32-36). Even assuming the County had any authority to delegate budget decisions to Mr. Schilling,[28] together with the plaintiff's evidence, when giving a generous inference to the plaintiff, indicates that the County Board followed Mr. Schilling's recommendations regarding providing funding to ASTOP. However, simply adopting the recommendation of a subordinate is not a delegation to make policy. *See St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("[S]imply going along with discretionary decisions made by one's subordinates, however, is not a delegation to

---

[28] This issue is never discussed by either party, as neither party discussed the state law basis for the Board's authority.

them of the authority to make policy."). Here, there is no evidence that Mr. Schilling had any more power than the power of persuasion, a far cry from the power to "set policy" for Fond du Lac County with regard to budget decisions. *Darchak*, 480 F.3d at 630 (holding that a municipality's "failure to review one personnel recommendation does not mean that the [municipality] systematically allow[ed] [an employee] to set policy on employment decisions or to make final decisions without [the municipality's] review."). Perhaps more importantly, the plaintiff has provided no evidence to indicate that the County Board did not retain its authority to reject any of the advice allegedly given by Mr. Schilling, meaning the director of DSS was not delegated any sort of policymaking authority over the budget for Fond du Lac County. *Rasche v. Beecher*, 336 F.3d 588, 600 (7th Cir. 2003).

Possibly the best argument the plaintiff has for municipal liability is that the County Board's decision to adopt Mr. Schilling's recommendations regarding ASTOP's funding constituted a ratification of Mr. Schilling's actions. However, this argument is equally unavailing. A Section 1983 claim "based on a 'ratification' theory must allege that a municipal official with final policymaking authority approved the subordinate's decision *and the basis for it.*" *Baskin v. City of Des Plaines*, 138 F.3d 701 (7th Cir. 1998) (emphasis added) (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994) (quoting *Praprotnik*, 485 U.S. at 127)). The "basis for it" language from *Praprotnik* has been interpreted to mean that a municipality "must approve both the employee's conduct and the basis for that conduct, i.e. the

employee's motivation." *Waters*, 580 F.3d at 584. In other words, "it is not enough for a plaintiff simply to show an intentional act by a policymaker that results in a constitutional deprivation." *Id.* at 583. Instead, a Section 1983 plaintiff "must prove culpability, i.e., that the policymaker intentionally deprived him [or her] of a constitutional right." *Id.* Here, there is absolutely no evidence that the final policymaker, the County Board, eliminated funding for ASTOP with the intent to retaliate against Ms. Nichols' free speech act.[29] Indeed, the plaintiff did not bother to depose any member of the County Board, the finance subcommittee, or the County Executive to find out what the decisionmakers' collective motivations were. The only evidence with regard to the culpability of those who were final policymakers with regard to ASTOP's grant for the 2006 budget comes from the defendants and indicates the Board passed the budget for non-discriminatory reasons. (Buechel Supp. Aff. ¶¶ 3, 6). The plaintiff suggests that all of the "defendants were angry with Ms. Nichols for her criticism of them" (Pl.'s Resp. Br. at 10), but cites to no evidence in the record to support her assertion regarding the County Board's intentions, relying instead on the plaintiff's own suspicions as to the Board's motives. However, mere "suspicions alone are not enough to defeat summary judgment." *Campion, Barrow & Assocs. v. City of Springfield*, 559 F.3d 765, 770 (7th Cir. 2009). At best, the evidence indicates that the County Board, including the finance subcommittee, merely rubber stamped Mr. Schilling's recommendations for ASTOP's funding, which

---

[29] In fact, there is no evidence the County Board was even *aware* of Mr. Schilling's alleged motives.

is not enough to impute liability for Ms. Nichols' constitutional injury to the County. *Waters*, 580 F.3d at 583-84. In short, given the evidence and arguments before the court at summary judgment, there is absolutely no avenue from which a jury could reasonably find the municipality liable.[30] Accordingly, the court will dismiss the Section 1983 claim with prejudice against the County. The court proceeds to examine the substance of the Section 1983 claim against Mr. Schilling, the remaining defendant.

## B. Mr. Schilling's Liability

In this case, the plaintiff's complaint contends that Mr. Schilling deprived Ms. Nichols of her "federally protected right of free speech" (Compl. ¶ 39), a right derived from the First Amendment to the United States Constitution as incorporated through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925). The First Amendment's prohibition against, in relevant part, any law "abridging the freedom of speech" is facially relatively simple. U.S. Const. amend. I. However, as Professors Garvey and Schauer have noted, First Amendment law, with its maze of

---

[30] While not articulated by the plaintiff, the court notes that Ms. Nichols' theory of why the County is liable sounds a lot like the "cat's paw" theory from Title VII law, where by the "discriminatory animus of a nondecisionmaker is imputed to the decisionmaker where the former has singular influence over the latter and uses that influence to cause the adverse employment action." *Staub v. Proctor Hosp.*, 560 F.3d 647, 651 (7th Cir. 2009). The Seventh Circuit has voiced extreme skepticism at the viability of such a theory as the basis of municipal liability, *see Waters*, 580 F.3d at 586 n.2 ("Imputing a non-decisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability . . . Given that well developed § 1983 municipal liability law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the cat's paw concept in this area of civil rights law"), and, as such, the court is constrained by the case law to similarly find that the cat's paw theory is not a viable means to find a municipality liable for its employee's conduct.

various formulas and multi-prong standards for an array of particular topics of speech, "is far more complex than the Constitution's command."  John H. Garvey & Frederick Schauer, THE FIRST AMENDMENT: A READER 169 (2d ed. 1996). Unfortunately, the complexities of First Amendment law seem to have been lost on the attorneys for both parties in this matter, as crucial and fairly basic issues regarding the plaintiff's claim have either been half-heartedly discussed or wholly ignored in the briefs submitted to the court.  Nonetheless, the court cannot take a similar approach with this order, and the court must take a step back to discuss the nature of the plaintiff's First Amendment retaliation claim in order to determine whether the plaintiff can survive summary judgment.

Here, the plaintiff's complaint is not premised on the theory that Mr. Schilling directly prohibited Ms. Nichols from exercising her First Amendment rights.  Rather, the complaint is based on the premise that Mr. Schilling retaliated against Ms. Nichols for her exercise of her First Amendment rights.  (Compl. ¶ 1).  Such a claim is well established in First Amendment law, as the Supreme Court has recognized that a violation of a person's First Amendment rights may arise from the "deterrent or 'chilling,' effect of government [conduct] that fall[s] short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972).  As a result, the government cannot punish a person on the basis of constitutionally protected speech. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("For if the government could deny a benefit to a person because of his [or her]

constitutionally protected speech or associations, his [or her] exercise of those freedoms would in effect be penalized and inhibited" and the "government [would] produce a result which it could not command directly."). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10, 592 (1998)). Accordingly, to prevail on a First Amendment retaliation claim under Section 1983, Ms. Nichols must prove that: (1) she engaged in constitutionally protected speech; (2) Mr. Schilling engaged in adverse conduct against her; and (3) Mr. Schilling would not have engaged in such conduct if not for the plaintiff's protected speech. *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010); *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).[31]

---

[31] The court notes that the *Bivens* court references the third prong as "the defendants were motivated, at least in part, by his protected speech." 591 F.3d at 559. The requirement that the plaintiff just needing to show that his or her speech "was a motivating factor in defendant's decision" has been squarely rejected by the court in *Fairley*. 578 F.3d at 525-36 ("These decisions do not survive [*Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)], which holds that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law."). Recent Seventh Circuit decisions affirm *Fairley*'s discussion of the causation prong, and, accordingly, the court proceeds under *Fairley's* understanding of the causation prong. *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 501 (7th Cir. 2010) ("Our older cases omitted the but-for causation requirement . . . but the Supreme Court has recently clarified that unless a statute provides otherwise, the plaintiff bears the burden of demonstrating but-for causation in suits brought under federal law"); *see also Gunville v. Walker*, 583 F.3d 979, 984 (7th Cir. 2009). The court notes that the plaintiff utterly failed to cite to this update on the law, instead relying on older case law. (Pl.'s Resp. Br. at 2). Of course, the defendants do no better, failing to cite *any* case law – new or old – on the elements of a retaliation claim.

### 1. Was Ms. Nichols engaged in constitutionally protected speech?

Before the court reflects on whether Ms. Nichols has presented enough evidence at summary judgment indicating that she engaged in constitutionally protected speech, the court must first identify the speech acts that constitute the basis for the retaliation claim. The plaintiff, in her proposed findings of fact to the court, lists several complaints that she made to various agencies and individuals about the happenings in Fond du Lac County's DSS. *See* PPFF ¶¶ 5-8; Docket #36-12 Ex. 35. However, for all but two speech acts by Ms. Nichols, the plaintiff has failed to show that Mr. Schilling was aware of Ms. Nichols' various complaints about the DSS. This makes much of the evidence regarding the plaintiff's complaints to organizations like the American Civil Liberties Union and the Department of Justice's Victims Rights Office, wholly irrelevant to Ms. Nichols' retaliation claim. *Cunningham v. Southlake Center for Mental Health, Inc.*, 924 F.2d 106 (7th Cir. 1991) ("Without evidence that [the defendant] knew of the complaints, [the plaintiff] has given the jury no foundation for a finding that public actors retaliated against him unconstitutionally."). That leaves Ms. Nichols with two central speech acts that form the basis of the retaliation claim of which Mr. Schilling was aware. First, the plaintiff has provided admissible evidence indicating that Mr. Schilling was "informed" or "advised" that Ms. Nichols was "advising clients or suggesting to clients" that "they not be interviewed by DSS." *See* Schilling Dep. at 34. Second, Ms. Nichols has also provided evidence that in the "late summer" of 2005, it was "reported" to Mr.

Schilling that the plaintiff had "communicated to a public defender in a criminal case that she had exculpatory evidence that the DSS and [Fond du Lac Police had] improperly interrogated" a sexual abuse victim."[32] (PPFF ¶ 13). The court proceeds to determine whether those two speech acts – Ms. Nichols' comments to her clients and Ms. Nichols' communications with a public defender – entailed constitutionally protected speech.

Unfortunately, the briefing on the first element of the retaliation claim is where the wheels – if they were attached before – completely fall off the proverbial wagon for the attorneys on both sides. The overwhelming majority of the defendants' opening brief in support of their motion for summary judgment is devoted to the *Monell* issue and whether the plaintiff can proffer evidence to show that the County acted because of a constitutionally invidious reason. *See* Def.'s' Br. 3 - 6, 7. The remainder of the defendants' opening brief argues: (1) Ms. Nichols was not fired by ASTOP because of anything Mr. Schilling did, *id.* at 6-7; and (2) Mr. Schilling did not influence the Board because he did not have "authority to remove ASTOP's funds

---

[32] The exact nature of how Ms. Nichols voiced her complaints to a public defender is disputed and unclear. The defendants initially appear to agree with PPFF ¶ 13 that states in part that "Ms. Nichols had communicated to a public defender in a criminal case that she had exculpatory evidence that the DSS and [Fond du Lac Police] had improperly interrogated the sexual abuse victim." *See* Def.'s Resp. to PPFF ¶ 13 ("Agree except for time frame."). However, the defendants argue in their reply brief that the "plaintiff mistate[d] the factual record," (Def.'s' Reply Br. at 3), arguing that Ms. Nichols' complaints were not directed to a public defender, but instead were provided to the public defender through a third party attorney. *Id.* at 4-5. The defendants, however, have not provided any admissible evidence to support their story regarding the form of Ms. Nichols' complaint to the public defender. Even if the defendants had provided such evidence, all that would be created is a dispute as to the facts, which this court must resolve in favor of the non-moving party. *Thomas,* 630 F.3d at 663. Regardless, the court must accept the statement – with the exception of the date stated therein – in PPFF ¶ 13 as admitted. *See* Civil L.R. 56(b)(4).

from the budget." *Id.* at 8. Neither of those arguments reach the first issue of whether Ms. Nichols was engaged in constitutionally protected speech. Nonetheless, the plaintiff's attorney decides to make the argument for the defendant and argues in the response brief that Ms. Nichols was engaged in constitutionally protected speech because her free speech act was in regards to a matter of "public concern," an issue that was not raised in the defendant's original briefing. Pl.'s Resp. Br. at 2-3.

The plaintiff's reference to her speech being a matter of "public concern" is truly peculiar, complicates matters considerably, and requires the court to briefly explore how speech being a matter of "public concern" influences the court's analysis. The phrase "public concern" arises in the context of *public* employee speech cases, where a public employee contends that his or her employer – i.e., the government – has infringed upon the employee's free speech rights. The Supreme Court in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968), in analyzing a claim that a public employee was deprived of her First Amendment rights by her employer, sought a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court further explained that the First Amendment protects public-employee speech only when it falls within the core of First

Amendment protection – speech on matters of public concern. *Id.* at 147.

Moreover, the authority to restrict speech extends to those with an indirect employment relationship to government agencies, such as independent contractors, because "the government needs to be free to terminate both employees and contractors for poor performance." *Board of Commissioners v. Umbehr*, 518 U.S. 668, 674 (1996). As a result, a government employer may "impose certain restraints on the speech" of its employees and independent contractors, "restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004); *Waters v. Churchill*, 511 U.S. 661, 671 (1994) ("[T]he government as employer indeed has far broader powers than does the government as sovereign."). In *Umbehr*, the Supreme Court explored the difference in how First Amendment law treats claims made by public employees and ordinary citizens, describing a "spectrum" with government employees at one end, "whose close relationship with the government requires a balancing of important free speech and government interests," and "ordinary citizens" at the other end, "whose viewpoints on matters of public concern the government has no legitimate interest in repressing." 518 U.S. at 680. In sum, with its own employees or with those it has a sufficiently close relationship with as an employer, the government may take adverse action if that person's speech causes actual disruption to "promoting the efficiency of the public services it performs through its employees" such that those interests outweigh the speech's value. *See Pickering*, 391 U.S. at 567-68. However,

in a case where the government has retaliated against an "ordinary citizen," there is "no interest balancing involved," and the First Amendment is violated "if the individual engaged in conduct protected by the First Amendment and the government took action against the person because of that protected conduct." *Kinney v. Weaver*, 367 F.3d 337, 358 (5th Cir. 2004) (*en banc*).

Returning to the matter at hand, the plaintiff's declaration that "Ms. Nichols speech regarding the County . . . relates to matters of public concern" (Pl.'s Resp. Br. at 2), is extremely bizarre given the status of Ms. Nichols, a plaintiff that was employed as an employee of a *private* corporation that had *no known contract* with the government.[33]  *See* PPFF ¶ 2; *see also* DPFF ¶ 19.  The court is only left to scratch its head, as the plaintiff's attorney appears to be making a rather glaring concession that Ms. Nichols should be treated as a public employee under *Umbehr,* and, with that, implicitly suggests that the court apply a *more* rigorous standard by which the court evaluates her retaliation claim than what an ordinary citizen normally would be afforded under the First Amendment.  *See, e.g., Havekost v. United States Dep't of the Navy*, 925 F.2d 316, 318 (9th Cir. 1991) ("Because protected speech must address a matter of public concern in the *Pickering/Connick* cases, an employee may have a steeper hurdle than a *Perry* plaintiff"); *see also Vickery v. Jones*, 100 F.3d 1334, 1346 n.1 (7th Cir. 1996) (holding that an inquiry into whether the speech in question is of public concern is "wholly inappropriate" in the context

---

[33] The matter is even further complicated by the fact, as noted earlier in this opinion, that neither attorney opted to fully explore the relationship between ASTOP and the County.

of a private citizen's speech); *Schmidt v. Lincoln County*, 249 F. Supp. 2d 1124, 1133 (W.D. Wis. 2003) (refusing to evaluate the issue of whether the plaintiff's speech was a matter of "public concern," as no evidence had been presented indicating the plaintiff should be treated as a public employee). Indeed, all of the cases the plaintiff cites in outlining the general elements of a retaliation claim relate to plaintiffs who were employed by the government. *See Samuelson v. Laporte Cmty. Sch. Corp.*, 526 F.3d 1046 (7th Cir. 2008) (plaintiff was a public school teacher suing her school); *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004) (plaintiff was a correctional officer employed by a state prison, suing other employees of the prison); *Trejo v. Shoben*, 319 F.3d 878 (7th Cir. 2003) (plaintiff was a nontenured assistant professor at the University of Illinois suing his supervisors at the school); *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir. 1994) (plaintiff was an Assistant State's Attorney in Cook County, Illinois, suing his supervisors). The court will not spend too much time trying to determine if this court should treat the plaintiff's retaliation claim as it would that of an ordinary citizen or a public employee in an attempt to resolve the legal dilemma the plaintiff's attorney has imposed on his client, as arguments in opposition which are not made at the time the court is considering a summary judgment motion are deemed waived. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005); *see also United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (holding that "perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived

(even where those arguments raise constitutional issues)"). Accordingly, the court will accept that the proper framework in which to evaluate the retaliation claim is through the lens of treating Ms. Nichols as a public employee.[34]

To receive First Amendment protection, therefore, a public employee must speak (1) in the capacity of a private citizen (2) on a matter of public concern. *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). In *Garcetti,* the Supreme Court explained that adverse actions taken by the government in response to statements made as a part of an employee's "official duties," rather than "as a citizen," are not actionable retaliation, even if that speech relates to a matter of public concern. *Id.* at 418. The rationale the *Garcetti* court relied on in allowing government employers to discipline employee's speaking pursuant to their "official duties" is that government employers, no less than private employers, must have control over their employees' speech in order to operate efficiently. *Id.* Thus, "*Garcetti* requires a threshold determination regarding whether the public employee spoke in his [or her] capacity as a private citizen or as an employee." *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009). A determination of an employee's official duties "is a practical exercise that

---

[34] This is not to say that there is not an arguable basis by which to treat Ms. Nichols as a public employee. Indeed, the Ninth Circuit recently held that a treatment provider employed by a private organization that regularly received referrals from a state court's probation unit should be treated as a "public employee" under *Umebehr* with regard to the plaintiff's retaliation suit against the manager of probation services at the court. *See Clairmont v. Sound Mental Health*, 632 F.3d 1091 1100-02 (9th Cir. 2011). Facially, this case seems akin to *Clairmont*, and this court will proceed accordingly.

focuses on the duties an employee actually is expected to perform." *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008) (internal quotations and citation omitted).

Like other issues in this litigation, the *Garcetti* inquiry is unexplored by the parties. Nonetheless, the record as provided by the parties can allow this court to address the issue. The parties both agree that Ms. Nichols' job was as a licensed clinical social worker, with her official duties constituting helping provide "mental health services to individuals seeking treatment with" the organization. (PPFF ¶ 2); *see also* DPFF ¶ 19. Ms. Nichols' speech act in advising ASTOP clients to "not be interviewed by DSS," *see* Schilling Dep. at 34, was an act that was central to the "task [she] was employed to perform," *Sigsworth v. City of Aurora*, 487 F.3d 506 (7th Cir. 2007), dispensing advice to victims of sexual abuse. Accordingly, the plaintiff's speech with regard to the advice she gave to her clients was "not entitled to protection by the First Amendment." *Id.*; *see also Garcetti,* 547 U.S. at 421 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.").

The remaining speech act that underlies Ms. Nichols' retaliation claim is that she communicated with a "public defender in a criminal case that [the plaintiff] had exculpatory evidence that the DSS and [Fond du Lac Police had] improperly interrogated" a "sexual abuse victim." (PPFF ¶ 13; Schilling Dep. at 36-37). Such a communication appears, based on the state of the record, to be outside of Ms.

Nichols' official job duties, because communicating with a public defender who was representing a third party about the DSS's conduct was not a part of the plaintiff's job with ASTOP or was expected of her. (PPFF ¶ 12). Put more simply, providing exculpatory evidence to a public defender was "not one of [Nichols'] job duties because it was not part of what [she] was employed to do." *Morales v. Jones,* 494 F.3d 590, 598 (7th Cir. 2007). When viewed in a light most favorable to Ms. Nichols, the record supports a finding that the plaintiff was not speaking pursuant to her official duties when she communicated with a public defender and instead was communicating as a concerned citizen. *Cf. Clairmont,* 632 F.3d at 1106 (discussing the *Garcetti* test in regard to a domestic violence counselor's official duties). The defendants spent a considerable amount of its reply brief explaining that Ms. Nichols did not directly communicate with a public defender, but instead made her disclosures through the February 9, 2005 letter to Dr. Braacksma, which was, in turn, disclosed to an intermediary. (Def.'s' Reply Br. at 4-6). However, as discussed earlier in this order, the defendants have not provided any admissible evidence to support their assertions. Moreover, even if they had, Mr. Schilling's deposition provides enough evidence that Ms. Nichols did communicate with a public defender regarding DSS's alleged improprieties, (Schilling Dep. at 36-37),[35] and the court resolves factual disputes in favor of the non-moving party. Finally, the defendants do not provide an argument warranted by the case law for why it would even matter

---

[35] Perhaps there are hearsay issues with Mr. Schilling's testimony, but that issue is not raised by the defendants and is, therefore, waived. *Berkowitz*, 927 F.2d at 1384.

if it was undisputed that Ms. Nichols communicated through an intermediary to the public defender.[36]

Having found that Ms. Nichols' communications with the public defender were outside of her official duties, the court must now "inquire into the content of the speech" to ascertain whether the speech touches on a matter of public concern. *Spiegla,* 481 F.3d at 965. "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1216, 179 L. Ed. 2d 172 (2011) (internal citations omitted). "Deciding whether speech is of public or private concern" requires the court to examine the "'content, form, and context' of that speech." *Id.* The Seventh Circuit has noted that "[t]hough no one factor is dispositive, the content of the speech is the most important of the three." *Gross*, 619 F.3d at 704.

In this case, the court concludes that Ms. Nichols' disclosures to a public defender touched on a matter of public concern. With regard to the content of Ms. Nichols' speech, the plaintiff's complaints voiced deep concerns about how Fond du Lac County public officials treated sexual abuse victims and prosecuted those who

---

[36] Perhaps the defendants are hinting that Ms. Nichols' letter to Dr. Braackmas was made pursuant to her official duties or was not directed to the public defender, but this court cannot rule on undeveloped arguments. *Berkowitz*, 927 F.2d at 1384. The only legal argument the defendants appear to making relate not to the *Garcetti* issue, but rather to whether Ms. Nichols' speech was a matter of public concern.

were alleged to having committed sexual abuse, raising issues that are a "matter of intense public concern." *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) (noting that speech commenting on the criminal justice system constituted speech that was a matter of public concern); *see also Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998) (finding police officer's comments that exculpatory evidence was withheld in a murder investigation involved a matter of public concern); *see generally Koch v. Hutchinson*, 847 F.2d 1436 (10th Cir. 1988) ("After *Connick*, many courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties"); *cf. Knapp v. Whitaker*, 757 F.2d 827, 840 (7th Cir. 1985) ("[Plaintiff's] speech on these issues was not an attempt to inform the public that the administrators . . . were failing to discharge their governmental responsibilities . . . [or] aimed at uncovering a wrongdoing or breach of the public trust among . . . administrators."). Moreover, the context and form of the plaintiff's speech, even assuming it took the form of a private letter as the defendants assert[37] (Def.'s' Reply Br. at 7), still requires a finding that the speech in question implicated a public concern, as Ms. Nichols' apparent purpose in writing the letter was to raise an issue to those outside of the County

_____

[37] The defendants only argue in the reply brief that Ms. Nichols' speech was not a matter of public concern. (Def.'s' Reply Br. at 7). Typically, an argument raised in a reply brief is waived. *United States v. Lupton*, 620 F.3d 790, 807 (7th Cir. 2010). Here, the defendants were replying to an argument inexplicably raised by the plaintiff in her response brief. Given that the plaintiff opened the door in the response brief to a discussion on public employee speech, the court will entertain the defendants' argument on its merits.

about government malfeasance. Indeed, the First Amendment's speech protections are not limited to speech that is "broadcast[ed] to the world." *Wales v. Board of Educ.*, 120 F.3d 82 (7th Cir. 1997). Additionally, the Seventh Circuit has noted that the factors of form and context "can be clarified by an examination of an employee's motivation, and in this case, there is absolutely no evidence that Ms. Nichols' communications with the public defender were done to further some sort of private interest. *Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir. 2002)*; see also Wainscott v. Henry*, 315 F.3d 844, 850 (7th Cir. 2003). In short, when looking at the content, form, and context of the plaintiff's speech, the court concludes the speech implicated a matter of public concern.

Having concluded that the plaintiff's communications to a public defender were made pursuant to a public concern, the court's inquiry as to whether Ms. Nichols' speech is protected under the Constitution is not yet complete. Instead, the court must employ the *Connick-Pickering* balancing test, where the court must next determine whether "the interest of the employee as a citizen in commenting upon matters of public concern outweighs the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees." *Sigsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007) (citing *Connick*, 461 U.S. at 147-48 and *Pickering*, 391 U.S. at 568). The Seventh Circuit has provided a list of "factors to consider in applying *Pickering* balancing," including:

(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000). The burden is on the government in proving that the interest of the public employee is outweighed by that of the state as an employer. *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

Here, having examined the *Greer* factors, the court cannot find evidence in the record indicating that Ms. Nichols' communications on an issue of public concern to a public defender actually or even plausibly had an impact on her work or her relationship with her co-workers. The defendants have simply not come close to shouldering their burden that the government's interests were so significant as to outweigh Ms. Nichols' interests in commenting on issues of public concern. The only argument the defendants hint at in their briefs that even comes close to touching on issues related to the governments' interests appear in the defendants' reply brief. The defendants argue that the County had an interest in ensuring that child sexual abuse cases not be referred to a "specialist who is critical of the defendants' procedures." (Def.'s' Reply Br. at 7). However, the defendants do not provide a warrant for their assertion – it is unclear to the court what harm would result by allowing sexual abuse victims to be counseled by someone who is so

concerned about her clients' well-being that she worked actively to ensure that her clients were not mistreated by the state. Perhaps the plaintiff's criticism of Fond du Lac County officials impacted the services she provided in some way, but no party has properly explained the interaction between the County and ASTOP, and, ultimately, the onus is on the defendants to provide a warranted reason for why Ms. Nichols' speech should be potentially sanctioned by the government. *Gustafson*, 290 F.3d at 909. The defendants have not made a "substantial showing" indicating the disruptive potential of Ms. Nichols' speech, and the court is not permitted to speculate as to how the plaintiff's speech could have disrupted the services she was providing the County vis-a-vis ASTOP. *Id.* ("*Pickering* balancing is not an exercise in judicial speculation."). Weighing purely hypothetical risks of a potential and unexplained conflict of interest versus the substantial interests of the plaintiff in commenting on how the criminal justice system in Fond du Lac County treated sexual abuse crimes, the court can easily conclude that the balance strongly favors Ms. Nichols. Moreover, having resolved the *Connick-Pickering* balancing test in the plaintiff's favor, the court finds that Ms. Nichols has presented enough evidence on summary judgment to indicate that she was engaged in protected speech when she communicated with a public defender, and the court proceeds to examine whether the evidence at summary judgment, when viewed in a light most favorable to the plaintiff, shows that Mr. Schilling engaged in adverse conduct against Ms. Nichols.

**2. Is there sufficient evidence to show that Mr. Schilling engaged in adverse conduct against Ms. Nichols?**

In order to constitute retaliation for the exercise of First Amendment rights, the action complained of must be "sufficiently adverse" to deter the exercise of those rights. *Power v. Summers*, 226 F.3d 815, 820-21 (7th Cir. 2000). The retaliation does not need to take the form of something "monstrous to be actionable under the First Amendment." *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995). Instead, the conduct merely needs to create the potential for "chilling employee speech on matters of public concern." *Id.* The "effect on freedom of speech may be small," with actions such as "ridicule for bringing a birthday cake to the office" having the potential to deter the exercise of First Amendment rights. *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982). However, adversity is measured by an objective standard, and the alleged adverse action cannot be "so trivial that a person of ordinary firmness would not be deterred from holding or expressing" their beliefs. *Pieczynski v. Duffy*, 875 F.2d 1331 (7th Cir. 1989).

Applying these legal standards to the case at hand, the court finds that Ms. Nichols has provided enough evidence to indicate that Mr. Schilling engaged in adverse conduct against her. Specifically, the plaintiff has presented evidence that the former director of Fond du Lac County's DSS voiced several complaints to ASTOP regarding Ms. Nichols, including having a meeting with ASTOP's directors

about the plaintiff.[38]  PPFF ¶ 17.  Moreover, Ms. Nichols has provided evidence that the DSS, while Mr. Schilling was directing the department, began to stop making referrals to ASTOP in the wake of his complaints about Ms. Nichols.  *Id.* ¶ 21.  The plaintiff has also indicated that the cessation of such referrals was extremely harmful to ASTOP's and Ms. Nichols' stream of business.  *Id.* ¶ 22.  There is also evidence in the record that Mr. Schilling successfully pressed the County Board to stop funding ASTOP and to instead fund a competitor.  *Id.* ¶¶ 23, 28; Schilling Dep. at 129-130.  Moreover, the plaintiff has presented evidence that funding for ASTOP was immediately restored upon Ms. Nichols' termination.  PPFF ¶¶ 31-33.  The sum of the evidence, when viewed in a light most favorably to the non-moving party, indicates that Mr. Schilling:  (1) repeatedly informed Ms. Nichols' employer about DSS's disapproval of the plaintiff's performance; (2) withdrew referrals and, with them, a critical stream of revenue from the plaintiff's employer; and (3) advised the County Board to eliminate funding from the plaintiff's employer because of Ms. Nichols.  Moreover, the record is clear that Ms. Nichols was fully aware of Mr. Schilling's conduct and was, therefore, prone to be influenced by his actions.  As such, when viewed under the totality of the circumstances, Mr. Schilling's conduct had the strong potential to chill Ms. Nichols' free speech activity, *DeGuiseppe*, 68 F.3d at 192, as Mr. Schilling engaged in conduct that would make the termination of

---

[38] It makes little difference to the court that Mr. Schilling's requests to ASTOP made at the August 30, 2005 meeting were ignored, (Schilling Dep. at 48), as Schilling's complaints alone had the potential for chilling Ms. Nichols' speech.  *DeGuiseppe*, 68 F.3d at 192

Ms. Nichols' employment at ASTOP far more likely. *Power,* 226 F.3d at 820 (holding that the question of whether an act is sufficiently adverse must be decided in the context of the circumstances of a particular case). As such, the court concludes that the plaintiff has proffered enough evidence to survive the second prong of a First Amendment retaliation claim.

### 3. But for Ms. Nichols' speech, would Mr. Schilling have acted adversely toward the plaintiff?

The last prong that Ms. Nichols needs to prove in order to establish a Section 1983 retaliation claim is the causation prong. The plaintiff must demonstrate that "but for the protected speech" the government actor would not have taken the same adverse conduct. *Kodish,* 604 F.3d at 501; *see also Fairley,* 578 F.3d at 525-26. The defendants raise a host of "alternative reasons" for why ASTOP's funding was temporarily cut in the fall of 2005. Specifically, the defendants argue that ASTOP's grant was temporarily cut in the 2006 budget because of a "budgetary shortfall" (Def's' Br. at 7), and not because of the action of Mr. Schilling, who had "no budgetary authority." *Id.* at 3.

However, the defendants' arguments confuse the central issue. The plaintiff has presented evidence that Mr. Schilling undertook adverse actions against Ms. Nichols – that is, conduct with the potential to chill Ms. Nichols' free speech activity, *DeGuiseppe,* 68 F.3d at 192 – in the form of complaining to her employer about her job performance, withdrawing the county's referrals to ASTOP, and advising the County Board and subcommittees to eliminate Ms. Nichols' employer's funding

grant.  All of Mr. Schilling's actions – independent of whether Mr. Schilling was the reason the County Board decided to eliminate ASTOP's funding – was conduct that was done because of Ms. Nichols' speech act.  For example, Mr. Schilling met with ASTOP officials at the August 30, 2005 meeting *because* of concerns he had with Ms. Nichols' complaints to a public defender.  (PPFF ¶ 17).  Likewise, if the court accepts the plaintiff's evidence as true, Mr. Schilling was conferring with the County Executive and the County Board with regard to the situation with Ms. Nichols and providing advice to the Board regarding the appropriate expenditures the County should be providing to ASTOP and its competitors *because* of the alleged "conflict" that arose between DSS and Ms. Nichols as a result of the plaintiff's speech act.  (PPFF ¶ ¶ 23, 33-34; Schilling Dep. at 62).  Moreover, there is evidence in the record that DSS, who was headed by Mr. Schilling, "cut in half" its referrals to ASTOP, the heart of ASTOP's business, at the exact time Mr. Schilling learned of Ms. Nichols' complaints and voiced concerns about them to ASTOP.  (PPFF ¶¶ 21-22).  *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (holding that in a First Amendment retaliation case a plaintiff may establish causation by proving "a pattern of antagonism coupled with timing.").  In short, Mr. Schilling took the actions he did because of Ms. Nichols' exercise of her free speech rights.[39]

---

[39] The defendants argue that the conduct was an effort to eliminate a conflict of interest between DSS and Ms. Nichols.  However, this is an argument for why Ms. Nichols' speech was not protected under the First Amendment, not an argument for why Mr. Schilling's conduct was not caused by Ms. Nichols' speech act.

Moreover, even if the budget cut was the touchstone for the adverse conduct, the defendants' arguments remain unpersuasive. The fact that Mr. Schilling did not have any formal authority to approve the budget is irrelevant – there is evidence within the record that Mr. Schilling's advice controlled with respect to the funding issue in question here.[40] (PPFF ¶¶ 33-34). Such evidence can rightfully be said to show that Mr. Schilling had a significant influence that motivated the cut in funding to ASTOP which, in turn, created the potential to chill Ms. Nichols' speech. *Cf. Kodish,* 604 F.3d at 509 ("It is a plausible inference, if not the sole inference, that Sebesta exerted a singular influence on the evidence presented to the Board and therefore even more likely that, under a less demanding standard."). Additionally, the defendants' argument that ASTOP's funding was cut because of unspecified funding shortages strains credulity, given that ASTOP's funding was restored merely a few months later and the finance subcommittee was supplementing the budget in late 2005, allowing a reasonable jury to surmise that if Fond du Lac County was truly having a fiscal crisis in the fall of 2005 warranting ASTOP's grant to be cut, the Board would not have restored the substantial majority of ASTOP's funds a few months later and would not have added to their alleged fiscal crisis in late 2005. *See Kmetz v. State Historical Soc'y*, 304 F. Supp. 2d 1108, 1136 (W.D. Wis. 2004)

---

[40] The court notes the plaintiff only presented evidence on the one time question of whether Mr. Schilling had influence over ASTOP's appropriation in 2006 and, therefore the court's statement is made in light of, and not in conflict with, its analysis of the *Monell* issue.

("When a defendant in a First Amendment case invokes a "fiscal restraint" explanation for its action, it must prove that it was actually fiscally restrained.").

The defendants also argue that ASTOP terminated Ms. Nichols because she "did not get along with ASTOP's management" (Def's' Br. at 4), not because of any action by Mr. Schilling. However, this argument again relies on the false assumption that Ms. Nichols' termination is the only means by which adverse conduct can occur under a First Amendment retaliation claim; as discussed above, several of Mr. Schilling's actions, independent of whether Ms. Nichols' employment was terminated because of those actions, were sufficiently adverse to potentially chill Ms. Nichols' exercise of her free speech rights.[41] However, having said that, the defendants' argument, while it does not implicate the causation prong of a First Amendment retaliation claim, does implicate the requirement that the plaintiff provide "proof of damages." *Fairley*, 578 F.3d at 526. The defendants' argument is that Mr. Schilling's adverse conduct did not cause Ms. Nichols to *lose her job* because she was terminated by ASTOP for insubordination. (Def.'s' Br. at 6-7). A necessary implication of that argument is that Ms. Nichols should not be able to recover damages related to items such as "lost income." *Fairley,* 578 F.3d at 526. Indeed, this is central to the plaintiff's complaint, in which Ms. Nichols asks for damages that

---

[41] The court notes that the original complaint broadly incorporated all the actions taken by the defendants – not merely the eventual termination – as "adverse" in nature. (Compl. ¶ 39) ("The allegations more particularly described above constituted intentional adverse action and retaliation against Ms. Nichols, with malice or with reckless indifference to Ms. Nichols' federally protected right of free speech.").

are the product of the "emotional distress, pain, suffering, losses of wages, benefits, expenses, insurance, and advancement opportunities [lost]" that were caused by Mr. Schilling's alleged conduct. (Compl. ¶ 39). However, items such as lost wages, benefits, and expenses can only be put in front of the jury if there is evidence that Ms. Nichols lost her job *because of* Mr. Schilling's conduct. *Fairley,* 578 F.3d at 526 ("The second requirement is proof of damages . . . the largest item will be lost income, if plaintiffs can establish that the threats caused them to quit.").

Here, the defendants have presented evidence in the form of Ms. Keeler's affidavit that Ms. Nichols was terminated because of the plaintiff's insubordination toward Ms. Selk-Yerges. (Keeler Aff. ¶ 6). Ms. Nichols counters that there is a dispute of evidence as to the reason ASTOP terminated the plaintiff's employment, as the insubordination was the result of ASTOP's actions in the wake of Mr. Schilling's conduct. (Pl.'s Resp. Br. at 9). However, the only evidence Ms. Nichols cites to support her assertion is page 138 of her deposition. *Id.* However, the plaintiff has not provided the court with that page of the deposition – the plaintiff only provided page 137 – and, as such, the court finds that it is undisputed that Ms. Nichols' was *terminated* from her employment for reasons other than Mr. Schilling's

conduct.[42]   As a consequence, Ms. Nichols will have to proffer damages evidence that is unrelated to her termination and instead relates to the damages *actually caused* by Mr. Schilling's conduct, leaving a fairly narrow issue for trial.

## CONCLUSION

The court, having resolved the defendants' motion for summary judgment, will in due course schedule this matter for trial.  Given that this case will go forward, the court expects far better preparation for trial, which is no easy task in this branch of the Eastern District of Wisconsin.[43]  The parties' attorneys are reminded of a phrase

---

[42] There is no reason why the plaintiff could not provide the court with the proper deposition testimony.  The court directs the parties to comments the court made in an order that has been in the public record well before the parties filed summary judgment:

> More broadly, this occurrence highlights the utter inefficiency of the protocol followed by most attorneys when filing for summary judgment. Perhaps filing numerous excerpts from a single person's deposition testimony made sense when courts relied on paper documents. However, the existence of electronic filing renders such practice archaic. If the parties are going to be citing to various portions of a witness' deposition, then instead of requiring the court to engage in an archeological dig to find whichever excerpt it needs at any given time, and instead of risking not providing the court with the relevant excerpt, the parties should have simply filed the entire deposition in one place and then both cite to that one filing whenever referring to the witness' deposition. The simple fact is that while the current CM/ECF system holds the promise of greater efficiency for the court, much of that promise is mooted by attorneys' antiquated practices. Going forward in future cases before this court the parties' attorneys should be much more mindful of how to use the system so as to reduce clutter, promote clarity, and ensure efficiency. See 07-CV-926, Docket #215, Scheduling Order dated 2/2/2010 (proffering suggested guidelines for the filing of materials in support of motions for summary judgment).

*Lemmermann v. Blue Cross Blue Shield*, 713 F. Supp. 2d 791, 803 n.12 (E.D. Wis. 2010).

[43] The parties are reminded that "[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986).

often invoked by this court: "adequate preparation remains the hallmark of an effective advocate."

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #23) be and the same is hereby **GRANTED in part** and **DENIED in part;** and

**IT IS FURTHER ORDERED** that this action against defendant "Fond du Lac County" be and the same is hereby **DISMISSED** with prejudice.

Dated at Milwaukee, Wisconsin, this 29th day of April, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge